IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>vs.<br><br>SERGIO JIMENEZ,<br><br>     Defendant. | 8:21CR30<br><br>**FINDINGS AND RECOMMENDATION** |

  This matter is before the Court on the Motion to Suppress (Filing No. 17) filed by Defendant, Sergio Jimenez. Defendant filed a brief (Filing No. 18) in support of the motion and the government filed a brief (Filing No. 22) in opposition.

  The Court held an evidentiary hearing on the motion on May 13, 2021. Defendant was present with his attorney, Desirae Solomon. The government was represented by Assistant United States Attorney, Crystal Correa. Nebraska State Patrol Task Force Officers with the Drug Enforcement Agent ("DEA"), Nicholas Bonney ("TFO Bonney") and Nicholas Jaworski ("TFO Jaworski") testified on behalf of the government. The Court received into evidence the government's Exhibit 1 without objection. A transcript (TR.) of the hearing was prepared and filed on June 11, 2021. (Filing No. 30). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be denied.

### BACKGROUND

  On September 24, 2020, TFO Bonney and TFO Jaworski were working at an Omaha bus station at 1601 Jackson Street in their capacity as DEA task force officers in the commercial interdiction unit looking to identify individuals that may be smuggling currency, drugs, or weapons. (TR. 8-10, 60). Both TFOs were wearing plain clothes with no police markings and were carrying concealed firearms. Both TFOs also had audio-visual recording devices attached to their baseball caps. (TR. 11-12, 60). At approximately 6:00 a.m., TFO Bonney saw an individual, later identified as Defendant, exit a passenger bus and begin to look for something in his duffel bag outside the bus terminal. (TR. 12-13). TFO Bonney observed that Defendant had a blanket draped over himself. No other passenger had a blanket or heavy winter coat, and TFO Bonney

himself was wearing a short sleeve t-shirt. (TR. 15). TFO Bonney testified the lighting "was not the greatest" and approached Defendant to ask if he could use a flashlight. (TR. 12-13). Defendant agreed and TFO Bonney directed his flashlight into Defendant's duffel bag. TFO Bonney noticed that, as Defendant looked through his duffel bag for his boarding pass, the bag contained minimal clothing, about enough for one day. TFO Bonney did not touch or manipulate Defendant's bag. TFO Bonney testified Defendant found his boarding pass and walked away, ending the less than one-minute encounter.[1] (TR. 14-16).

TFO Bonney initiated a second encounter with Defendant a few minutes after the Defendant ended the first encounter. TFO Bonney testified he wanted to talk to Defendant to "get his story" because of the minimal amount of clothing TFO Bonney observed in Defendant's bag and because Defendant was wearing a blanket draped over a jacket. (TR. 18-19). TFO Bonney was also familiar with the itinerary of the bus and knew it had just arrived from Denver, Colorado. (TR. 17). TFO Bonney approached Defendant, identified himself as a law enforcement officer, and told Defendant he was not in trouble or under arrest. (TR. 19). TFO Bonney did not remove his concealed firearm, block Defendant from leaving, or tell Defendant he was not free to leave. (TR. 27). TFO Bonney asked Defendant about his itinerary. Defendant stated he had started his trip in Colorado and was going to Iowa to visit his uncle for a week. (TR. 20-21). During the course of this conversation, Defendant initially stated he had purchased his own ticket, but later indicated his uncle purchased the ticket for him. (TR. 38-39, 49-50, 53). At TFO Bonney's request, Defendant provided an ID from California, which matched the name on Defendant's ticket. (TR. 20-22). When TFO Bonney asked why Defendant began his trip in Colorado if he was a resident of California, Defendant stated he actually began his trip in Bakersfield, California, where his mother lives. (TR. 23). TFO Bonney identified both Colorado and California as "source" states. (TR. 20, 23).

TFO Bonney testified Defendant then readily consented to a search of his duffel bag and of the backpack he was wearing underneath the blanket; TFO Bonney believed this to be unusual and a potential tactic to get TFO Bonney to leave him alone, as Defendant knew there was nothing in his bags. (TR. 24-25). TFO Bonney testified Defendant awkwardly "shimmied" the backpack off of him while purposely trying to keep the blanket wrapped around him. (TR. 25). TFO Bonney searched Defendant's backpack and duffel bag and did not find contraband or any other illegal

---

[1] This encounter was not recorded.

items. TFO Bonney then ended the encounter with Defendant to assist with "some sort of confrontation" in front of the bus terminal. TFO Bonney testified he attempted to record this second encounter with his baseball cap camera, but he had failed to charge the camera the night before and it was inoperable. (TR. 26).

TFO Bonney wanted to initiate a third encounter with Defendant due to TFO Bonney's observations from his first two encounters. Because TFO Bonney realized his camera was not working, he asked TFO Jaworski to accompany him and use his camera to record the interaction. (TR. 28-29). The two TFOs approached Defendant; TFO Bonney spoke to Defendant and TFO Jaworski stood nearby and activated his camera to record the interaction. (Ex. 1).[2] TFO Bonney again identified himself and told Defendant he was "not in trouble." Defendant was still wearing the blanket and had his bags on the ground. TFO Bonney explained why officers were at the station and what they were doing, and also told Defendant that "some of [his] story doesn't make sense." (TR. 30-31; Ex. 1 at 0:33-54). Defendant explained his itinerary again, stating he did start his trip in Colorado, then went to California to visit his mother, and was on his way to Iowa to visit his uncle. (TR. 31; Ex. 1 at 0:57-1:42). Defendant denied having weapons on him but did not consent to a search of his person or agree to lift up his jacket so TFO Bonney could see his waistband. TFO Bonney believed it was odd Defendant would agree to a search of his bags but not his person. (TR. 32-33; Ex. 1 at 1:44-2:33). At this point, TFO Bonney decided to detain Defendant and move him to a room in the back of the bus station. (TR. 33). Defendant bent down to pick up his bags, but TFO Jaworski stopped him and stated he would get them. TFO Jaworski simultaneously removed Defendant's blanket saying, "I just don't want you reaching for stuff" or "see any weapons . . . pop out." (Ex. 1 at 2:36-47). As TFO Jaworski removed the blanket, TFO Bonney began to touch the outside of Defendant's abdominal area where TFO Bonney had noticed a bulge or "anomaly" or "deformity." (TR. 34; Ex. 1 at 2:47-51). TFO Bonney testified he did not know what the bulge was, but it felt hard and was something he had "never felt" before in other pat downs. (TR. 34-35). TFO Bonney knew it was not a gun but testified it "could be something strapped to him, even a bomb." (TR. 35).

TFO Bonney led Defendant to a nearby room and began handcuffing Defendant, noticing another bulge in the small of Defendant's back. (TR. 35; Ex. 1 at 2:45-3:05). TFO Bonney stated

---

[2] The audio of the initial few minutes of this encounter contained on Exhibit 1 is somewhat difficult to hear due to background noise of the bus station and due TFO Jaworski's distance from TFO Bonney and Defendant.

he could "feel something" on Defendant and asked what it was, but the other officers in the room immediately indicated to TFO Bonney that he needed to stop and advise Defendant of his *Miranda* rights. (TR. 36; Ex. 1 at 3:32-45). TFO Bonney then provided Defendant with a *Miranda* rights advisement using his phone as a reference. Defendant indicated he understood his rights and replied, "not really," when TFO Bonney asked if Defendant wanted to speak to him. (TR. 37; Ex. 1 at 4:34-5:24). TFO Bonney then outlined the things he had found to be suspicious leading to his belief Defendant was body smuggling and Defendant eventually admitted he had drugs on his person. (TR. 38-39; Ex. 1 at 5:22-6:24). Defendant was subsequently searched and found to be carrying a large quantity of methamphetamine strapped on his body. (TR. 39-40).

Defendant filed the instant motion to suppress evidence and statements obtained at the bus station on September 24, 2020, alleging they are fruit of Fourth and Fifth Amendment violations. Defendant argues that during the first encounter TFO Bonney conducted a warrantless "search using his eyes" when he shined his flashlight into Defendant's duffel bag, and that any subsequent evidence or statements obtained as a result of this search must be suppressed. (TR. 79; Filing No. 18 at p. 2). Defendant next argues that, during the third encounter, the TFOs illegally detained Defendant and conducted a warrantless search of his person when they removed the blanket he was wearing and patted the bulge in his abdominal area without consent or probable cause. (Filing No. 18 at pp. 2-3; TR. 82). Defendant further contends that any statements he made after his arrest without a *Miranda* advisement should be suppressed as a violation of his Fifth Amendment right against self-incrimination. (Filing No. 18 at p. 3).[3]

The government contends that TFO Bonney's first interaction with Defendant was a consensual encounter during which TFO Bonney did not conduct a search implicating the Fourth Amendment. (Filing No. 22 at pp. 6-7). And, although Defendant does not explicitly take issue with the second encounter with Defendant, the government asserts it was also consensual. (Filing No. 22 at pp. 7-9). The government further asserts TFO Bonney's third encounter with Defendant began as a consensual encounter that turned into a *Terry* stop once officers had reasonable suspicion justifying a protective pat down, including removing Defendant's blanket and patting the outside of Defendant's jacket. (Filing No. 22 at pp. 9-10). Officers then had probable cause

---

[3] At the evidentiary hearing, the government represented it does not seek to introduce any of Defendant's statements made after he was handcuffed prior to receiving *Miranda* warnings, thereby rendering that portion of Defendant's motion moot. (TR. 71-72).

4

to search Defendant once he was *Mirandized* and admitted he was carrying drugs. (Filing No. 22 at p. 12).

## ANALYSIS

Defendant first argues TFO Bonney conducted a warrantless "search using his eyes" during the first encounter when he shined his flashlight into Defendant's duffel bag as Defendant searched for his boarding pass. But, "police officers do not conduct a search in the Fourth Amendment sense merely by using their eyes" and the use a flashlight is of "no importance." *United States v. Trower*, 285 F. App'x 321, 323-24 (8th Cir. 2008)(citing *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008)("Observing objects in plain view violates no reasonable expectation of privacy, which obviates the need for a search warrant."). Here, TFO Bonney testified he simply shined his flashlight into Defendant's duffel bag—after Defendant agreed he could—and observed a minimal amount of clothing. TFO Bonney did not touch or manipulate Defendant's duffel bag, and therefore TFO Bonney did not conduct a "search" implicating the Fourth Amendment.

Defendant next challenges the constitutionality of TFO Jaworksi's removal of Defendant's blanket and TFO Bonney's touching of the outside of Defendant's clothing during the third encounter, citing *United States v. Aquino*, 674 F.3d 918 (8th Cir. 2012). (Filing No. 18 at p. 2; TR. 82). To properly address this argument, the undersigned magistrate judge considers the totality of the circumstances and TFO Bonney's observations made during his interactions with Defendant prior to that point. See *United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012)("In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training.").

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); see also *Florida v. Bostick*, 501 U.S. 429, 434 (1991)("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage--provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 201 (citing *Bostick*, 501 U.S. at 434-35).

5

Here, although TFO Bonney's first two encounters with Defendant were not captured on an audio-visual recording, the undersigned magistrate judge finds TFO Bonney's testimony is credible regarding what took place. TFO Bonney was wearing plain clothes and his firearm was concealed on both occasions he spoke to Defendant. As discussed above, TFO Bonney's first encounter with Defendant lasted less than a minute and was ended by Defendant when he walked away, which demonstrates Defendant felt free to leave, as he in fact left. When TFO Bonney approached Defendant a second time in the public bus terminal, he identified himself as a law enforcement officer but told Defendant he was not in trouble or under arrest. TFO Bonney spoke to Defendant alone, did not remove his concealed firearm, and did not block Defendant from leaving. Under these circumstances, a reasonable person in Defendant's position would have felt free to leave, and thus these were consensual encounters. See, e.g., *Drayton*, 536 U.S. at 204 (finding no detention when "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of [the bus] exits, no threat, no command, not even an authoritative tone of voice."). TFO Bonney asked Defendant questions about his itinerary, asked for his identification, and asked for permission to search his bags, all of which are permissible during a consensual encounter. See *id.* at 201. TFO Bonney ended this second encounter to respond to an unrelated incident, and there is no evidence in the record to suggest he ordered or commanded Defendant to stay in place or wait for TFO Bonney to return.

The undersigned magistrate judge also finds the third encounter began as a consensual encounter sharing same characteristics of the initial two consensual encounters: TFO Bonney identified himself as a law enforcement officer and told Defendant he was not in trouble or under arrest, did not remove his concealed firearm, and did not block Defendant from leaving. Defendant was not restrained or given commands. Although TFO Jaworski accompanied TFO Bonney on the third occasion, as TFO Bonney testified, this was because TFO Bonney had discovered his camera was not working and wanted to record the interaction. TFO Jaworski was also wearing plain clothes and positioned himself in a way that was unobtrusive as possible while still being close enough to record TFO Bonney and Defendant's conversation. TFO Bonney was the only one speaking to Defendant, which the audio-visual recording shows took place in a conversational and not threatening or intimidating tone. The TFOs used no "physical force or show of authority" to restrain Defendant's liberty and did not block his path, *Terry v. Ohio*, 392 U.S. 1, 20 (1968),

6

and "the tone of the entire exchange was cooperative," *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996). Under the circumstances, the initial part of this third encounter was consensual.

"[A]n initially consensual encounter can ripen into a seizure requiring reasonable suspicion or probable cause." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988). "As a consensual encounter progresses, a police officer may act in some way to restrain a person's liberty and prevent her from walking away." *United States v. Estrella Moreno*, No. 8:18CR258, 2019 WL 1792302, at *3 (D. Neb. Apr. 24, 2019), aff'd sub nom. *United States v. Moreno*, 988 F.3d 1027 (8th Cir. 2021)(citing *Campbell*, 843 F.2d at 1092). A citizen's behavior and the surrounding circumstances may also give rise to "a reasonable fear of harm . . . sufficient to justify a seizure for a short period of time, in order to conduct a [protective] pat-down search." *Id.* (quoting *United States v. Ellis*, 501 F.3d 958, 961 (8th Cir. 2007); accord *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000) ("The danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop has commenced.").

Here, the third encounter between Defendant and the TFOs remained consensual until Defendant denied consent for a search of his person and denied that he had a weapon, shortly before TFO Jaworski removed Defendant's blanket and TFO Bonney touched Defendant's clothing to check for weapons. At that point, the encounter became "a search and a seizure for Fourth Amendment purposes," requiring reasonable suspicion. *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000). A law enforcement officer is permitted to conduct "'a limited, warrantless search for the protection of himself or others nearby in order to discover weapons' so long as the search is based on 'a reasonable, articulable suspicion that the person may be armed and presently dangerous.'" *United States v. Moreno*, 988 F.3d 1027, 1031 (8th Cir. 2021)(quoting *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002)). "When evaluating the lawfulness of a protective search, 'the totality of the circumstances – the whole picture – must be taken into account.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Under an objective standard, the question is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* (quoting *Terry*, 392 U.S. at 27).

In this case, TFO Bonney identified factors that raised his suspicions that Defendant was engaged in criminal activity and could possibly be armed, although Defendant repeatedly denied having any weapons. First, even though it was September, Defendant was wearing a blanket over

7

a jacket whereas no one else in the bus terminal was wearing a blanket or heavy coat. Defendant also provided somewhat inconsistent details about his trip, at one time stating he had started in Colorado, but later stated he had started his trip in California to visit his mother (after TFO Bonney saw Defendant's California ID). TFO Bonney testified both Colorado and California are "source" states. Defendant also had indicated his trip would be about a week long but TFO Bonney had noticed only about a days' worth of clothing in Defendant's bag. Defendant was also inconsistent as to whether he or someone else paid for his bus ticket. And, after Defendant consented to a search of the backpack he was wearing underneath the blanket, Defendant awkwardly "shimmied" the backpack off so that the blanket stayed wrapped around him, which suggested to TFO Bonney Defendant was attempting to conceal something.[4] Although each of these factors individually minimally justify reasonable suspicion, as there are a great number of innocent travelers from the entire "source" states of Colorado or California, and Defendant's statements about his itinerary were not completely inconsistent, in the aggregate, and particularly in combination with Defendant's movements to keep a blanket around him as it to conceal something, TFO Bonney had the requisite reasonable suspicion to conduct a protective frisk. See, e.g., *United States v. Dortch,* 868 F.3d 674, 680 (8th Cir. 2017)(finding a defendant's movements suggesting he was attempting to conceal something added additional support to the officer's reasonable suspicion the defendant was armed).

The Eighth Circuit in *Moreno* affirmed this district court's conclusion that a protective frisk of a bulge that officers reasonably believed could be a bomb was permissible under similar circumstances presented in this case. As in *Moreno*, the TFOs were conducting interdiction at the same bus station and initiated a consensual encounter with an individual wearing a blanket. Also as in *Moreno*, Defendant made movements to purposely keep the blanket around him as if to conceal something. Further, like *Moreno*, Defendant had traveled from a "source" state and had a visible bulge underneath his clothing. Similar to the officer in *Moreno*, TFO Bonney did not reach under Defendant's clothing, but instead "briefly touched an area on top of [his] clothes, that was visible to him after [the defendant] had lifted the blanket." *Moreno*, 988 F.3d at 1033.

---

[4] But, while TFO Bonney found it suspicious Defendant consented to a search of his bags but not his person, the undersigned magistrate judge does not attach significance to this refusal because "[i]f refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections." *United States v. Moss*, No. 4:08CR3020, 2008 WL 2859048, at *10 (D. Neb. July 21, 2008)(Kopf, J.)(quoting *United States v. Santos*, 403 F.3d 1120, 1125-26 (10th Cir. 2005)).

Rather than address whether officers had reasonable suspicion to conduct a protective frisk, Defendant instead asserts the TFOs lacked probable cause to remove his blanket, equating the blanket removal with the officers' lifting of a pant leg in *Aquino*, the latter of which was considered a search requiring probable cause. (Filing No. 18 at p. 2); see *Aquino*, 674 F.3d at 923. The undersigned magistrate judge does not find this to be an apt comparison. Defendant was completely clothed underneath the blanket, including wearing a jacket and backpack underneath. As demonstrated by the audio-visual recording of the encounter, the blanket was wrapped around Defendant's shoulders and was open in front, such that his abdominal area was visible. TFO Jaworski's removal of the blanket occurred simultaneously with TFO Bonney's patting of the bulge around Defendant's stomach area; the area touched by TFO Bonney was accessible with or without the blanket removal. So, unlike *Aquino*, wherein the officers violated the Fourth Amendment by searching a bulge underneath an article of clothing without first performing a protective frisk, 674 F.3d at 923, here TFO Bonney performed a very brief protective frisk of the outside of Defendant's jacket, properly limited in scope based on his observation of the concealed bulge under Defendant's clothing. See *Moreno*, 988 F.3d at 1032-33.

After touching the obvious bulge, TFO Bonney testified he did not know what it was, but it felt hard and was something he had "never felt" before in other pat downs. TFO Bonney knew it was not a gun but testified it "could be something strapped to him, even a bomb." So, rather than immediately searching Defendant after feeling the unidentified hard bulge, the TFOs led Defendant to a nearby room, handcuffed him, and provided him with a *Miranda* rights advisement. It was only after Defendant was *Mirandized* and admitted the bulge was drugs that he was searched, at which point probable cause for the search existed. See, e.g., *United States v. Binion*, 570 F.3d 1034, 1040 (8th Cir. 2009)(suspect's admission he had an ounce of marijuana in his pants established probable cause).

In sum, TFO Bonney did not conduct a warrantless "search using his eyes" by shining a flashlight into Defendant's duffel bag during the first consensual encounter and developed reasonable suspicion justifying a protective frisk of Defendant during the third encounter. Accordingly, Defendant's motion to suppress should be denied as the TFOs did not violate Defendant's Fourth Amendment rights.

Upon consideration,

**IT IS HEREBY RECOMMENDED** to United States District Court Robert F. Rossiter, Jr., that Defendant's Motion to Suppress ([Filing No. 17](#)) be denied.

Dated this 12th day of July, 2021.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.